All right, Mr. Bowser, we'd be happy to hear from you. Good morning, Your Honors, and may it please the Court, Adam Bowser, on behalf of Appellant CuriosityStream. I'm going to ask you, please, to put that microphone as close as you can. Is that good, Your Honor? Yeah. How is that? There we go. Okay, perfect. So the only issue here that I think we really need to get into is whether CuriosityStream's terms presented an offer which the plaintiffs in the case below then assented to as per the terms. If there's any questions on the facts, I'm happy to address those, but I think the chief issue that I'd like to address here is the Court's recent Marshall decision and how that framework basically will resolve, I think, this case in favor of CuriosityStream in terms of the enforceability of its online terms of service. So I'd like to get to that if anyone has any questions on the facts. Can I just ask you, this actual versus constructive notice thing is driving me crazy, and maybe you can help me. So they click a box that says, by going further, I represent that I have read the terms and conditions of service.  I know I'm not quoting it exactly, but broadly speaking. And then those terms of service say that by doing this other thing, I agree to arbitrate. That, at a high level of generality, is the way this works? Correct. Okay, so I'm trying to figure out how to deal with the possibility, nay likelihood, that they did not, in fact, in the world, read the terms of service. Because, let's be honest, everyone goes to websites, and lots of people click buttons that say they read things that we all know they didn't actually read. I'm trying to figure out if that's an actual notice issue. So let's posit the true state of the world is the following. And let's make it, let's get rid of the notice issue entirely. Let's say they literally wrote out a piece of paper that said, I read the terms and conditions of service. The person actually wrote those words. That's true. And it's also true that, as a factual matter, the person did not, in fact, read the terms of service. Is that an actual notice issue? Is that an estoppel issue, that because you said you read it, you're estopped from later denying that you didn't read it? Is that a constructive notice issue? Like, how do we think about the fact pattern of where a person writes out a piece of paper that says, I read something that they did not, in fact, read? Like, how do we legally deal with that situation? Which strikes me as the most likely situation here. Well, I would say if they're admitting to it on a piece of paper, they have an admission that there's actual knowledge. But that sounds like an estoppel theory. I think so. Like a kind of, like you're not, having said you read it, you're not allowed to later claim you didn't read it. Correct. I mean, at the end of the day, we don't need to get there, because we just need inquiry notice under Marshall. And so I think where the district court goes fundamentally wrong. Is the inquiry notice in the, whether you have a conspicuous offer? Whether. Because Marshall dealt with whether there was a conspicuous offer, and it said no. Here the district court said there was a conspicuous offer, and it gets the assent part of it, right? Correct. She said the layout of the offer was conspicuous. They would have seen that. And then we get to the manifestation of assent, which is where I think the real legal error comes into play. That was why I was, you know, Marshall spends a lot of time on the first part, and some time on the second part, but mostly on the first part. And that seems to influence the second part. I do believe here we have to analyze, you know, the first prong and the second prong distinctly, because I think that's where the error resides. And so this is the key point. So you have the first prong of Marshall is notice of the offer. That's distinct from the offer itself. So what the district court did was essentially overlay the second prong, manifestation of assent, back into the first prong. There had to be some sort of duplicative manifestation of assent on the sign-up page. Whereas the sole purpose of the notice of the offer, the notice of the terms, is to get you to the offer. And then we get to, this is probably second day law school, Your Honor, where we're talking about basically the offer controls what is the manifestation of assent required. And so the sole purpose, again, and I think I would just like to clarify or read from Marshall directly, where she says, Marshall does not dispute that a conspicuous alert on the screen before her drawing her attention to the existence of contract terms elsewhere in the document would have been enough to put her on inquiry notice of those terms. That is a wise concession. Courts, including in South Carolina, generally find that when a website provides clear and reasonably conspicuous notice that there are contract terms available by scrolling down or clicking a hyperlink, the user is on reasonable notice of those terms even if she never reads them. Let me, I'm wondering if our decision here isn't governed to an extent by our precedents. Judge Harris recently wrote an opinion in Marshall v. Georgetown Memorial Hospital which dealt with this issue. And she emphasizes in that opinion that the notices of an offer must be clear and conspicuous. And the notice of the offer in Marshall was much clearer and more conspicuous than the notice here. And yet, our Court of Appeals said that it was not sufficient. And the notice in Marshall actually had emblazoned in capital letters, application process is subject to arbitration. And so why isn't, given the fact that we have a recent decision by this court, and this seems to me to be less clear and conspicuous than that. And even something that was more clear and conspicuous was still held to be insufficient to set up an arbitral contract. And so I'm wondering whether we are not under some obligation not to create a ripped out within our own precedent. Well, I would say Marshall is, I would respectfully disagree on the facts of Marshall where it was clear. Because what the, the facts of Marshall were that there was a submit button at the top in isolation that didn't signify anything. There was not, there was no notice from the submit button that there were terms on offer. There was no legally binding language around there. The notice you're referring to about the employment application is subject to South Carolina law. And I believe what Judge Harris was saying there was that was not in any way an indication that there was a contract on offer, just what law would apply. And then you get down to the fact that. But the terms in the Marshall case were at the bottom of the screen. And the terms in our case are on an entirely different page. And in terms of clarity and conspicuousness, again, it strikes me that the Marshall notice was found wanting, even though the terms were on the same page. And here you have to scroll to a different page to find it. So, you know, I just don't want our president to be going this way and that way. No, no. And I would welcome the opportunity, if it makes sense to your honors, that we would have some supplemental briefing on Marshall that came out after our briefing closed, if that would be helpful. But if not, the whole point of Marshall was that there was not even a contract on offer in that entire screen. Here, and I think what Marshall makes clear is that you need to give someone notice of the existence of the terms. And that is effectively the essence. If you ruled against here that putting people on direct notice of hyperlinked terms, that is the essence of Internet contracting generally. I think that would create chaos. One of the questions you ask in these sorts of cases is how easy is the fix? It's not all that easy for the subscribers to fix the situation, but you can save yourself so much trouble in the future by just saying we read and agreed to. The fix, from the standpoint of those who offer subscription services, is so easy here. And that's one of the things it seems to me you ought to ask who can adapt to the ruling and who can make the fix. And the fix on your part is pretty darn simple. I would agree that we can modify. If you were a lawyer and you were advising on how to set up your web page, wouldn't the first thing you do be go to your client and say, wait a minute. It's not enough just to say that you've read something. You've got to make it clear in that same line that you agree. As a lawyer, you would go directly to your client to make sure that was done. If that were a legal requirement, yes, I would recommend that. But I think the point here is they are agreeing. I think it's an emphasis on, hey, you're about to – so I guess logically if you just had the by subscribing I agree to the terms. But don't you read things you don't agree with? I read things all the time and I find myself saying I don't agree with that. That's a good question because let's take the paper contract example where you have your deed for your house. You're going through that. If you're even in the closing office, going through it really fast, initialing everything. Then you get to the 8 percent interest rate. And you say, well, I don't agree with that. But then you go on and sign the agreement. That's the point here is that they had inquiry notice. What did you sign? You signed something that said that you read it. The point is on this internet contracting, there's a great danger that people can be caught by surprise on something. It's not the kind of carefully negotiated contract that we see in the normal business world. With many, many contracts you have a sense of who the opposite party is. And you have a sense of trust or you have a sense of mistrust. And that personal dynamic enters into the formation of the contract. But here you don't have any of that. And the dangers of people being led into unsuspected situations seem to me greater than in this kind of contracting than in the normal thing. And I think that in reading Judge Harris's opinion, I thought that was what she was getting at. I believe what she was saying there was that when you have to go search for contract terms, and I'll have a direct quote here, to put a user on reasonable notice of the need to search for contract terms, there must be some clear and conspicuous statement. Can I go back to the ascent point that Judge Quattlebaum asked? I just want to make sure I understand. In your view, the ascent here is not the clicking continue. The ascent is registering for an account, right? Just so I understand the way the structure of the argument works is it says if by clicking continue, you say you've read the terms. So now I go to the terms. And the terms say by creating an account, you agree to the following, including the arbitration. So the ascent here is the creation of the account, right? Yes, that is exactly right. Before you, I want to hear the whole answer. But is it right that you have to do something, you have to make a click to move from the terms of use? There's nothing. Do you have to click that I've read that in order to go forward? There's an agreement. Well, I guess the point would be that in order to complete the registration, you have to click the sign up now button, which is synonymous with register. And to just heighten this question, there's not something regarding the place where it says I've read. That's just there. You don't have to have – it says if you subscribe, that says I've read them. Right. That there is saying – There's not some preliminary step you have to click in order to then go register, correct? Well, you have to complete your registration with your payment information, and then that signs up, and then you have the disclosure saying by subscribing, you've read the terms, and then you can click the link, and then you complete the registration process for the subscription by clicking sign up now. All right. I'm sorry. Just heighten the question. Nope. You've answered it. So I think this is the important point, or the key point here, is that basic contract law restatement, Section 30, Section 50, is that you manifest assent to the offer. So we define how manifestation of assent is very clearly in the terms themselves. The terms are the offer. And so, again, where I think the district court goes wrong is by requiring – once you know there's a contract on offer, that makes you look at the terms. That's Meyer. That's Melloby-Zumper. Even if you go back to Nguyen, kind of the Ninth Circuit Fountainhead case for all of this, the Barnes and Noble where they're talking about browse wrappers, click wrap, they cited favorably to a case that simply said review terms with the hyperlink. That was good for the Nguyen case as well. So the whole point is that notice of the offer is just notice. We have to – does the notice itself, is that conspicuous? And the district court said yes. Then she also said what we define as manifestation of assent is also unambiguous in – and that should have been game, set, win, match. So that is really the legal analysis. But aren't you requiring two steps where one would do? Well, how would you – I guess as a conceptual matter, and if we're talking about by subscribing, I agree to the terms. Logically, how would you know that's an offer unless you clicked it? Like what are you agreeing to unless you read it? The whole point of the notice is that you're just putting someone on notice, inquiry notice that terms exist. You should read them. In fact, you are agreeing that you read them. And it's the offer itself, the terms that everyone – I agree to the Facebook case that says, look, I think everyone's comfortable enough with online contracting now that you understand terms of service. That's an offer by itself. So in the same way that I agree to the terms or I agree that I've read the terms, it's just getting you to the terms. That's the sole function of prong one. Prong two is manifestation of assent. And in order to answer that question, you have to go to the offer itself. And we say use or register. And they have done both. The only way they have a case here is by using and registering for the site. Why not just say you have read and agreed to? It's just three words. People do that, but I guess the point would be even in Marshall. That would be sufficient, don't you? It would be sufficient but not necessary. I believe Marshall specifically says as long as you clearly tell someone that use could bind them, that's also a way of – so the bottom line for contract law is that as the offerer, we are the master of our offer. And as long as we clearly communicate what is going to bind someone to the terms, and if they do that, that's the manifestation of assent. So I know I'm out of time, and I'm happy to take up anything on rebuttal. All right. Thank you, Your Honors. Mr. Bogdanovich. Good morning, Your Honors. Stefan Bogdanovich appearing on behalf of plaintiffs and appellees, Rohan Dhruva and Joshua Stern. We're here today because CuriosityStream filed a motion to compel arbitration. After having read that motion, Judge Gallagher did not agree with it, and so she denied the motion. After having read Judge Gallagher's order, CuriosityStream did not agree with that, and so it filed this appeal. And after having read those appellate briefs, we did not agree, which is why I'm here today. How does this coincide with our precedent in Marshall? Your Honor, I think Marshall provides a lot of helpful rules. Provides what? A lot of helpful rules about Internet contract formation and inquirinos in particular and how to analyze this. So one of the things that my friends on the other side began with is a lot of these presumptions about offer and acceptance and a lot of the case law that they rely on fits neatly in paper contracting. So one of the things that they repeatedly cite is you have a duty to read contracts, right, and you can't get out of a contract by saying you didn't read it. But here, no one's arguing that's the defense. Okay, so this is really important. So do you agree that for purposes of deciding this case, we have to assume that your clients read the terms? No. They clicked a box saying, I've read the terms, right? Not necessarily. They clicked a box that said sign up now. They clicked a box that said by clicking a box that says sign up now, you are certified. So let's just posit. I buy your argument that it's different to say that I've read something, and I agree with it. But let's posit that's true. But when I say I've read something, I'm saying I've read it, right? If you say that in common practice. And I know there's a footnote in your brief that says other courts. You do not ask us to affirm that Judge Gallagher did not decide this case on the theory that your clients did not read the terms, right? Right. That's correct. And you have not asked us to. You have this like a weaselly little footnote, but there's not a section of your brief that said even if the district court was wrong about what she said, you should affirm on the alternative grounds that she was wrong in assuming we read the terms. That's not the ground you're asking us to affirm on. That's right. Okay. So therefore, it seems to me we have to assume that your clients actually read the terms. And then when I read the terms, I see that it says by doing X, you agree to Y. When I read the document, it tells me by doing X, you agree to Y. And your friends on the other side say there is literally – so we agree that your clients had accounts or used the website. Your friends represent, without contradiction from you, there is literally no way to use this website without signing up. Is that right? You can't see any videos on this website unless you create an account. That's correct. Okay. So therefore, I think it seems undisputed that your clients did in fact create an account, which is the very condition that the terms say if you create an account, that action is an agreement to the terms of service. And this is the place that it seems to me the district court just went fundamentally wrong. So you read something that says if you do X, you've agreed to Y. Your client did X. I don't know how that's not agreement to do Y. Your Honor, it's not because the actual text of the terms of use. So let's assume they get on the page.   The statement says your act of using the site and or registering with the site signifies you've agreed to the terms of use. What Judge Gallagher noted there is if that language were binding, then clicking the Sign Up Now button is immaterial. You've already used the site. But your clients did click the site. And that's a great argument why a person who they tried to force arbitrate, who never clicked the box, that person's got a great argument they don't have to arbitrate. But that's not your clients. And so the fact that some other people might have a great argument why they don't have to arbitrate, I don't see how it gives your clients an argument that they don't have to arbitrate. Your Honor, it's because as this court noted in the recent Marshall decision, there everything was on the same web page. But the text that actually notified them about the terms, that text actually suggested that the matter had already been decided. But there the difference was that the information in Marshall that the defendant there sought to rely on, you had to scroll down past the part you were operating. Here, the information that we're talking about, the arbitration provision, isn't down at the bottom of something that you have to scroll and scroll to scroll to. It's on a hyperlink that the district court says was conspicuous. Right, but it was on a separate web page. And this would be the first case, at least that I'm aware of, where the notice that's actually tying your agreement to a contract isn't even nearby the button, but it's located on a completely separate web page. You mean by the hyperlink? That's correct. I'm sorry to interrupt you, but it just seems to me, I kind of get how as we embarked on this online world, there was a lot of precaution, maybe almost paternalistic sort of views of these contracts. I mean, we're pretty well into that now. At some point, is there some notion that if online activity and commerce is going to be as prolific as it is now, that we don't think clicking on a hyperlink is that crazy a thing anymore? Look, I'm not good at that. But I mean, if I see a hyperlink and it has terms of use and it says I agree with them, and then I put, we haven't even talked about this much, you put your credit card information in. I mean, in order to do this, you have to put your credit card. This isn't like you just kind of use it and do that. In order to be in this situation, you've had to put your credit card information in before you say I register. That seems like a pretty big step, isn't it? Your Honor, it is. But what courts time and again have said is that when they're doing transactions online, we can't assume the consumer knows anything else other than that they're agreeing to a promise to pay. When the button says sign up now, the most obvious inference that you can make when a consumer sees that is by clicking sign up now, I'm assenting to sign up now. Even if a few inches above it says by signing up now I'm saying I've read the agreement? So there's a difference there. It doesn't say I've read the agreement. It says I've read the terms of use. Courts time and again have said that the phrase terms of use or terms and conditions may have different meanings to different people, and it's not the same as a legal contract. What if rather than a hyperlink, it said the terms of use were spelled out on the website itself? So you've got all those terms of use. Then you've got credit card. Then you've got submit. If it's not in a hyperlink but it's on the actual website, would you agree you have a contract? Imagine this website. Everything that was in terms of use was cut and paste, and he says we're going to put it on the website. We're not going to make you click to the hyperlink. It's on the website. And that would very likely be enforceable, yes, and I wouldn't be here arguing there was an unambiguous.  If it was on the same. Recognition of who we're dealing with here. These are not the people who are doing this are not the most sophisticated people in the world. And in addition, what lawyer represents them? They're not represented by counsel in the way that in most contract formations they are. They're not sophisticated in the ways of business. They don't know what they're waiving really when they go to arbitration, if they're waiving their right to a trial, if they're waiving all of these things. They're not aware of all that. And as I say, you have unsophisticated, unrepresented people who are waiving an important constellation of rights, and we're not making it perfectly clear to them. And as I say, when you look at these sorts of cases, you ask which party can adjust. The universe of consumers can adjust, but the people who have the lawyers and the sophistication can adjust. They can read it, and they can make it clear, all in one place, that you not only read something, but that you agree to something. And you have to understand who the different people on the opposite sides of the table are, and they could not be more different from classic contract formation principles. That's absolutely correct, Your Honor. And, you know, again, our friends on the other side want to analogize this to paper contracting. Here's the big difference. In the old-fashioned days, say you're at a car dealership, the salesman's worn you down all day, and then they pass over the paper contract in front of you, and they ask you to sign on the dotted line. The law has said in that kind of a circumstance, even if you haven't actually read it, we'll assume you agree to it by your physical act of putting in your signature and signing on the dotted line, because it's crystal clear to you that what was presented to you in that moment was a contract. When you're simply on a website clicking through pages, it's not obvious that what's being presented to you is a contract. Just put it in one place, and, as I say, the fact that you've read the terms of the agreement, I'd say 50 percent of the stuff that I read during the course of the day, I don't agree with it. That's exactly right, Your Honor, and that's the difference between if you're being presented with a contract and you sign it, that's different than if you're being presented with a legal brief. Or, in this case, when all you're simply presented with is a hyperlink to a terms of use. Can I go back to something you said about hyperlinks that just struck me as jarring? You suggested there was something remarkable about saying that you can be bound by hyperlinked terms of use. Doesn't Marshall itself say you can be bound by hyperlinked terms of use, as long as they're reasonably conspicuous? But there's no rule that says the terms of use can't be hyperlinked. And the Second Circuit has also said that, applying California law. Yes, Your Honor. So there's no – we would not be the first court in the world to ever say you can be bound by hyperlinked terms of use. No, you'd be the first court to say you could infer the unambiguous manifestation of assent, where the language telling you that your click signifies assent is not located near the button you're actually clicking, but on an entirely separate web page. That's what I meant by that. In terms of this Court's decision in Marshall, to Your Honor Wilkinson's point, it's incredibly easy to create an enforceable contract online. I don't mean to cut you off, but I think Judge Wilkinson's right. I mean, it would have been very easy to say read and agree. I mean, we see those all the time. And so I don't think – but I'm not sure, maybe you can tell me why I'm wrong here, that just because you could have done that makes not doing it unenforceable. Those are different things. I mean, maybe the best practice is to say – the best practice is to have a box probably and say you've got to click it to go. Then we know we're there. But I don't know if that's what the law requires. And so – and I also hear you. I think you're right. I didn't see any case that affirmed a situation like this as a valid contract. I also didn't see any case that involved – that rejected a situation like this. This is kind of different than most of the cases I saw. Your Honor, it is different. However, again, I think what we come back to is one thing that the First Circuit, Second Circuit, Ninth Circuit, and Tenth Circuit have all said is that if we don't have proof a consumer actually knew about the contract terms, to find inquiry notice, the unambiguous manifestation of assent is essential. But that's the problem with – if it said, for example, if it just said by clicking I agree, then there's an argument you're not on notice. But the problem here is what it says is I've read. I'll just ask you the same question. I'll ask your friend on the other side. Like, it just – something – so for purposes of this question, assume for the sake of argument, as Judge Gallagher concluded, that the statement I've read was sufficiently prominent to alert a person to it, okay? Like, let's imagine your clients wrote out a piece of paper that said I've read the terms of use. It just seems to me that fundamentally your argument depends on a claim that your clients did not, in fact, read the terms of use. And it's just – like, whether it's a stopple, whether it's inquiry notice, whether it's actual notice, I just don't understand how a person who says I've read something can then later claim I haven't read something. Again, I don't think the question is whether or not the consumers read or didn't. No, but I think it does because once you've read it, if I assume that you've read it, I assume you saw the language that said when I then do X, I've agreed to Y. And then you do – like, acceptance via conduct is something I learned on day four of – like, I don't know, but in – like, you don't – there are two ways to create a contract. One to create a contract is you make an offer and I say I accept your terms. And the other way is that you say I'd like to make a contract if you agree do X. And when I do X, that's acceptance, right? That's black-letter contract law. It is when it's obvious to you that what's being offered and accepted to is a contract. And again, online, time and again courts have said we can't necessarily assume that. So can I ask you – the other thing that just I want to make sure I get a chance to ask you is the implications of your position. It's not just that you're not bound by the arbitration clause. It's that you're not bound by any of the terms of use at all, right? This argument that you're making is not limited to the arbitration clause. This – like, if you didn't – if I read doesn't mean I agree to, that means that you didn't agree to any of the terms of use, which means that you have a contract that has no terms of use, which seems weird, right? Your Honor, by inputting your credit card information, you're agreeing to pay for the service. Now, you shouldn't put in your credit card information and like – The arbitration thing is in many ways a subject all its own. But what strikes me about this is that you're asking for so little. You're not swinging for the fences here. You're not asking that arbitration of subscription contracts be impermissible. You're saying, look, arbitration has a role in these cases and just be clear about it. And the reason that I'm not sure you – that you're indicating a disagreement or a problem with every term of the agreement, what we're dealing with in this case is an arbitration clause and what we're dealing with is the Supreme Court's repeated statements that, yes, we agree with arbitration, but you can't do it by surprise. You can't ambush somebody into arbitration. You just have to be clear about it. And so I think this case can be decided or addressed, particularly with the kinds of warnings and statements that the Supreme Court has said about the arbitration issue in particular. I'm not sure that it goes everywhere else to the other terms of the contract. We're talking about a particular process here. And much larger than this kind of case, we're talking down the road about having people committed and pushed into contracts with less than full awareness of what they were doing. And one of the things about the Internet is that it's all too casual. Click, click, click, click, click. And then something falls into place. And I tell you, a lot of people don't know what the heck they're clicking for or whatever. And it might aid them just a little bit to have it in one place and to have what is not in a separate page, but to have the whole doggone thing in one place and to have that one place be clear and to have the subject of arbitration visible rather than having a treasure hunt map. And that's all you're asking for. That's correct, Your Honor. I see your time is up. I just have one question. Can I first get a bottom-line answer to your question? Do you think your clients are bound by the other terms of service? And if the answer is no, how is that not an arbitration-disfavored rule that the Supreme Court has repeatedly told us that we're not allowed to do? They are not bound by the other terms of use. Contracts are the same. If I may make one brief point. As this Court noted in Marshall, in order for a button click or some kind of action online to manifest dissent, the notice near the button, they've required the notice to be near the button and they've required it to explicitly notify them of the legal significance of the button click. So here the notice was not near the button. The notice was continued onto a separate web page. And then the ramifications of that, if you were to allow this type of Russian nesting doll notice, where, as Judge Wilkinson's noted, they're requiring you to go on a treasure hunt to a separate page, what's to stop a person from citing that opinion later down the line and saying, then when you actually, you're on a web page, it says, Let me get into the totality of the circumstances litigation and say, well, what if it's on three pages or what if it's on two and a half pages? And then we go into that sort of fact-bound totality of the circumstances stuff and it's litigious. And the question is why you don't cut it off at the beginning with clarity. I know clarity has its virtue, the minimization of litigiousness. And, you know, we can think of, I can think of all kinds of fact-specific cases that are, that will follow in this wake. And, but there's a way for good lawyers and good clients to make it all clear. And with that, they will foreclose not every piece of litigation, but they will foreclose a substantial bit of it. That's right, Your Honor. And, again, the onus is on website providers. They have complete control over their website. It's incredibly easy for them to design a checkbox that says, I read and agree to the terms. Thank you. Mr. Bowser, you have rebuttal time. All right. So just briefly I would like to address the arbitration issue, whether there needs to be a separate call-out for arbitration, which I respectfully don't believe to be the case. The real and only issue is whether there was enough notice to put someone on inquiry notice. And I think that's the key point here is inquiry notice, by definition, means I need to inquire somewhere else. It doesn't have to be on a single page. That is the whole basis of hyperlinks. That's how the Internet operates now. So if we have a disfavored ruling here where, hey, please read and agree that you've read the terms, and the terms themselves, which are clearly called out, pursuant to the district court's order, then that's the radical rule. I mean, the hyperlink doesn't have to be ‑‑ I mean, one way of looking at this is because it's hyperlink, it's invalid. I guess we can, in theory, do that. That would be, like I say, pretty remarkable. But the other way of doing it is to have more than you have on this Web site. I mean, you say, yes, I've agreed that I've read it. You don't say whether I have agreed to it, at least on that page. I mean, here it's a two‑step process. And all the cases, most of the cases that affirm these things have more of a one‑step process. You're asking us to approve something that it takes more steps and involves more links, not hyperlinks, but links in the chain, than most of the cases that do it. Now, I get the arguments, but it is different than most of the cases that affirm these things. Correct, but I don't believe two steps to ‑‑ you wouldn't know, again, let's take the example of I agree to the terms. You wouldn't know what you're agreeing to unless you clicked on the terms. So whether there's an arbitration clause, everyone has to click on the terms, and that's the point of ‑‑ No, but if it said, I've read and agree to the terms, it's a one‑step process.  Without knowing what you're agreeing to, yes, it would be a one‑step process. Well, but then it's on you, because you said you agree to it, and then you're on inquiry notice, and then we're off to the races, and then we're fine. But I've already agreed that I've read the terms. I know, but I'm just saying, it seemed like you were suggesting there's no way to do a one‑step process. I'm just positing that a fairly easy, I've both, because I know, I've identified the problem, if you just say you agree, then you run into that you don't agree, you're on notice. But if you say, I've read and agree to be bound, you have both agreed you're on notice and you've agreed, and that's one step. It is possible to do it in one step, right? In fact, I suspect that I've clicked innumerable things online where I simultaneously agree I'm on notice and agree to the terms. Probably everything I've ever done with Apple in my entire life, I assume. Right. And let's take paper contracts where, you know, I believe you were on the pro football case where you were talking about turning over for terms on the old tickets. Where does this notion of inquiry notice end? You can say, oh, to these consumers, oh, you had a duty, you were put on inquiry notice. You had a duty to inquire into this. You have a duty to inquire into that. You have a duty to inquire that. I mean, I think that people who design the web pages could construct a whole interesting labyrinth of inquiry notice for rather unsophisticated often, not always, but often unsophisticated people. So I'm just wondering, you know, how this inquiry notice idea translates to this context and also just how many links, as Judge Quattlebaum puts it, how many different steps, how many links? Step one puts you on inquiry notice. You've got to go to step two. Step two puts you on inquiry notice. You have to look at step three. So, you know, I don't understand that I'm very reluctant to let this inquiry notice concept run wild in an Internet environment. I don't think we have to define the outer contours of how many clicks would be too much because right now we're dealing with two steps. I don't want to be cute about it, but I'm dealing with my daughter coming down from trick-or-treating last night and we're learning how to tie shoes and it's over, under, through the loop. That's three steps. She's six years old and she can get it. So here we're having people that are going to a website. This is a scientific documentary website. We're not dealing with people that are unsophisticated. They can see a clear and conspicuous disclosure that says, I have read the terms. The first paragraph of the term says these terms apply to your use of the sites. Then the second paragraph in all caps says your affirmative act of using or registering the sites means you're bound. If you don't agree, don't use the sites. The third paragraph says here's the arbitration. So everything is explicitly called out very quickly in the terms that you're agreeing you have read. So I just don't think this is in any way different than. I like the use of your phrase, you are agreeing to have read. Not that you're agreeing. You phrased it in a way that I think helps to make my point. You use the phrase agreeing to have read. That's different from what we're talking about. Well, correct. But the whole point of the first prong of Marshall, we have to get back to Marshall and the two-prong test, which is the notice, the reasonable notice. The notice itself is not the offer. And I think that is what Judge Gallagher got wrong. She, again, assumed that you needed to have everything in the notice of the offer rather than the offer. That is not Hornbook contract law itself. Again, the offer defines how you manifest assent, and that has always been the law. So whether you're in a car dealership signing a paper contract, not represented by attorney, has an arbitration clause, or let's get to the I think one of the key cases here is the Southern District of New York says, it is not too much to expect regular Internet users to understand that the hyperlink phrase terms of use is really a sign that says click here for terms of use. You know, if we want to get what's not too much to expect, that's an argument that's very double-edged. It's not too much to expect of you to do. Do you understand that that's a tricky phrase you just used? Well, I think when we go back to Marshall, all they're asking for in the first prong of notice is that you know about the existence of the terms. That puts you on inquiry notice, and particularly here, where I believe the emphasis on, they're not trying to hide the ball. They're saying, hey, you're about to enter into an agreement. Please read it, rather than just clicking right through it. I don't think there's any type of trying to hide the ball here. It's a paraphrase. Okay. Okay. Thank you. Hold on a minute. Any questions? I'm good. I'm good. Thank you, Your Honors. I want to thank you, and we'll come down and greet counsel, and then we'll move into our final case.
judges: J. Harvie Wilkinson III, A. Marvin Quattlebaum Jr., Toby J. Heytens